## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANKIE BURK** | : | **08-274-01** |
| **RICARDO RAMOS** | : | **02** |

### ORDER & MEMORANDUM

### O R D E R

**AND NOW**, this 13th day of January, 2009, upon consideration of defendant Ricardo

Ramos's Motion to Suppress Physical Evidence (Document No. 35, filed August 28, 2008); the

Government's Response in Opposition to Defendant's Motion to Suppress (Document No. 53,

filed September 22, 2008); defendant Frankie Burk's Motion to Suppress Physical Evidence and

Alleged Statement(s) (Document No. 84, filed December 5, 2008); the Government's Opposition

to Defendant's Motion to Suppress Physical Evidence and Statements (Document No. 86, filed

December 11, 2008); defendant Burk's Supplemental Exhibit in Support of Defendant's Motion

to Suppress Physical Evidence and Alleged Statement(s) (Document No. 88, filed December 16,

2008); and the Government's Supplemental Response in Opposition to Defendant's Motion to

Suppress Physical Evidence and Statements (Document No. 89, filed December 16, 2008);

following a hearing and oral argument on December 15, 2008, for the reasons set forth in the

attached Memorandum, **IT IS ORDERED** as follows:

    1. Defendant Ricardo Ramos's Motion to Suppress Physical Evidence is **DENIED**; and,

    2. Defendant Frankie Burk's Motion to Suppress Physical Evidence and Alleged

Statement(s) is **DENIED**.

**M E M O R A N D U M**

I.    **Introduction**

Defendants Frankie Burk and Ricardo Ramos are each charged in a four count Indictment with: (1) possession with intent to distribute and aiding and abetting the possession with intent to distribute approximately 21 grams of heroin and approximately 3.4 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; (2) possession and aiding and abetting in the possession of a loaded .40 caliber H & K handgun in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and (3) possession by a convicted felon of a firearm in and affecting interstate and foreign commerce in violation of 18 U.S.C. § 922(g)(1).

Presently before the Court is defendant Ramos's Motion to Suppress Physical Evidence and defendant Burk's Motion to Suppress Physical Evidence and Alleged Statement(s). The Court held a hearing and oral argument on defendants' Motions to Suppress on December 15, 2008. For the reasons set forth below, both defendants' Motions to Suppress are denied.

II.   **Background**

A.    **Surveillance by Officers Landis and Linahan**

At approximately 12:45 p.m. on March 31, 2008, Police Officers William Landis and Timothy Linahan set up plain clothes surveillance in an unmarked vehicle at the corner of Rorer and Cambria Streets. (Suppression Hr'g Tr. 8–9, Dec. 15, 2008.) Officer Landis testified that, in his experience, this location is a "very well known drug location" for the sale of heroin stamped "Last Stop." (Id. at 8.) While at that location, Officers Landis and Linahan observed a black Chevrolet suburban vehicle ("SUV") drive by their surveillance vehicle at least twice. (Id. at 9–10.) The Officers then changed locations and parked at the corner of D and Cambria Streets.

2

(Id. at 13.) At this location, the officers observed the same SUV drive by their vehicle and park five feet in front of it. (Id.) The driver of the SUV did not commit any traffic violations. (Id. at 26, 71, 98.)

Officer Landis testified that he then observed two black males approach the passenger side of the SUV in close succession, approximately thirty seconds apart. (Id. at 14, 15–16, 31.) According to Officer Landis, the first male had United States currency in his hand, handed that currency to an occupant of the SUV through the passenger side window, received what appeared to be a small object in return, and walked away with a closed fist. (Id. at 14–15, 62.) The second male then approached the vehicle and did the same: handed United States currency to an occupant of the SUV, received what appeared to be a small object, and walked away with a clenched fist.[1] (Id. at 15.) Officer Landis also observed hand movements through the back windshield of the vehicle as these transactions occurred. (Id.) Officer Landis further testified that he recognized one of the two black males who approached the vehicle as Ulysses Hood, "a known dealer from Rorer and Cambria" who "wears the same glasses" and "same plaid jacket all the time" and whom Officer Landis has arrested on two prior occasions. (Id. at 16.)

Believing that two narcotics transactions had just occurred, Officer Landis put out flash information by police radio on the vehicle and the two males, identifying Mr. Hood by name. (Id. at 19.) Although the two males were never stopped or apprehended, the vehicle was stopped soon thereafter. (Id.)

---

[1] Officer Landis testified twice that he saw what appeared to be a small object being handed to one of the men who approached the vehicle. (Suppression Hr'g Tr. 14 (stating that one of the men "appeared to be handed an object" and that "it appeared to me he was being handed a small object").) On cross-examination, Officer Landis said he never actually saw the small objects. (Id. at 66 (stating "I never saw small objects").)

### B.      Vehicle Stop by Officers Cricelli and Kachigan

Police Officers Alex Cricelli and Edward Kachigan received the flash information on the SUV over the police radio and stopped it at the 3000 block of C Street, approximately two blocks away from where Officers Landis and Linahan conducted their surveillance. (Id. at 38, 69–70, 71.) Officer Cricelli approached the driver's side of the SUV and asked the driver for his driver's license, registration, and insurance through the open driver's side window. (Id. at 72, 80.) Defendant Burk was driving the SUV, and defendant Ramos was riding as the only passenger. (Id. at 72.)

### i.      Plain View Observation of Heroin

On direct examination, Officer Cricelli testified that "at the same time" that he asked for defendant Burk's license, registration, and insurance, he "looked in the passenger driver door, which is the back door[ of] the driver's side" and observed heroin packets "in plain view" on the floor in front of the rear seat behind the driver's seat and the passenger's seat. (Id. at 72.) On cross-examination by counsel for defendant Ramos, Officer Cricelli further testified that he observed heroin packets through the "back driver's side window . . . ." (Id. at 100.) On cross-examination by counsel for defendant Burk, Officer Cricelli testified that he observed the heroin packets through the driver's open window as defendant Burk was getting his license, registration, and insurance. (Id. at 80–81.) Officer Cricelli also stated that he was standing at the door post between the front seat and the rear seat on the driver's side when he observed the heroin packets. (Id. at 147.) He added that "everything happens" quickly and "in a continuous motion" when approaching a vehicle, asking for license and registration, and looking for evidence of contraband. (Id. at 84–85, 108.)

4

**ii.      Tinting of Windows and Visibility**

According to Officer Cricelli, he could see the heroin packets despite tinting on the windows of the SUV. (Id. at 100.) Jose Colon, a window tinter who works at Outkast Professional Window Tinting in Philadelphia, testified that on the day of the arrest, all of the SUV's windows were tinted. (Suppression Hr'g Tr. 121; Suppression Hr'g Def. Ex. 10.) The rear windows on the driver's side and the passenger's side of the SUV were manufacturer-tinted at fifteen percent,[2] as were the windows at the back of the SUV. (Suppression Hr'g Tr. 119.) The tinting on the windshield (fifty percent) and the front driver's side window and the front passenger's side window (fifteen percent) was performed at Outkast Professional Window Tinting. (Id.; Suppression Hr'g Def. Ex. 10.)

Officer Cricelli testified that he could see through the driver's side rear tinted window because "the tint wasn't that dark and, plus, it was daylight." (Id. at 100.). When questioned about the weather on the day of the arrest, Officer Cricelli further testified that "[i]t wasn't sunny, but it was daylight" and that he did not "recall any rain." (Id. at 110.) A defense exhibit—a blog sponsored by the Philadelphia Daily News—stated that approximately one hour before the arrest, skies were "overcast" and that it was "spritzing out." (Supp. Ex. Support Def.'s Mot. Suppress Ex. A.)[3] A weather report from the Philadelphia International Airport, located approximately fifteen miles away from the site of the arrest, submitted by the government on December 16,

---

[2] The percentages of tinting refer to the amount of light that enters through the window—the lower the percentage of tinting, the less light will enter the vehicle. That is, with fifty percent tinting, fifty percent of the outdoor light will penetrate the window. If the window is tinted at fifteen percent, only fifteen percent of the outdoor light will penetrate the window. (Suppression Hr'g Tr. 133–34.)

[3] This exhibit was submitted on December 16, 2008, the day after the Suppression Hearing. (See Supp. Ex. Support Def.'s Mot. Suppress.) As the government correctly points out in its response, the blogger's observations on the weather appear to have been made from Citizens Bank Park, but there is no evidence of the blogger's precise location. (Govt.'s Supp. Resp. Opp. Def.'s Mot. Suppress 1.)

2008, states that at 12:41p.m., there was "light rain," and from 12:54p.m. to 1:29p.m. when the arrest took place, there was a "light drizzle." (Govt.'s Supp. Resp. Opp. Def.'s Mot. Suppress Ex. A.)

According to Mr. Colon, visibility through tinted windows depends on a number of factors. If the weather is sunny, visibility increases. (Suppression Hr'g Tr. 121, 130.) Closer proximity to the vehicle increases visibility. (Id. at 121, 130, 131–132.) If other windows in the vehicle are tinted, thereby preventing greater penetration of light, it becomes more difficult to see through a tinted window. (Id. at 122.) Finally, if a window is down, allowing more light to enter, visibility is increased through an unopened tinted window. (Id. at 129.)

### iii.    Arrest, Alleged Statements, and Search and Seizure by Warrant

After observing the heroin packets in plain view, Officer Cricelli asked defendant Burk to step out of the SUV and placed him under arrest. (Id. at 75.) Officer Kachigan likewise asked defendant Ramos to step out of the passenger side of the SUV and placed him under arrest. (Id.) The officers confiscated $910 from defendant Burk's person and $442 from defendant Ramos's person. (Id. at 78, 85; Suppression Hr'g Def. Ex. 2.) Officer Cricelli also testified that after the defendants were placed in custody, he walked around to the passenger side of the SUV and "did a cursory look in the back" and observed the butt of a handgun protruding from a bag on the back seat, toward the passenger side. (Suppression Hr'g Tr. 76, 77, 100.)

Once defendants were in custody, Officer Cricelli did not question either of the defendants beyond obtaining standard biographical information. (Id. at 78–79, 96.) While doing so, defendant Ramos spontaneously stated that he was getting married and had wedding invitations in the SUV. (Id.) As the officers were confiscating money from defendant Ramos's person, defendant Burk also spontaneously stated that "he [defendant Ramos] has nothing to do

6

with that. That money's for an engagement ring. This is all mine." (Id.) Officer Cricelli asked no

follow-up questions upon hearing these statements. (Id.)

Following the defendants' arrest, the SUV was secured, without being searched, and

towed to a secure facility at 5301 Tacony Street. (Id. at 78, 79, 97.) No evidence was seized at

that time. (Id. at 97.) Officer Landis then prepared an application for a state search and seizure

warrant and served as the warrant affiant. (Id. at 20, 79.) At approximately 9:00p.m. that evening,

the warrant was executed and drugs, drug paraphernalia, and a loaded weapon were seized.

(Suppression Hr'g Def. Ex. 2.) On May 14, 2008, a federal search and seizure warrant was

obtained, pursuant to which additional evidence was seized. (Id. Def. Ex. 6.)

## III.    Standard of Review

"On a motion to suppress, the government bears the burden of showing that each

individual act constituting a search or seizure under the Fourth Amendment was reasonable."

United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Coward, 296

F.3d 176, 180 (3d Cir. 2002). The applicable burden is proof by a preponderance of the evidence.

United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

## IV.    Discussion

In the instant Motion to Suppress, defendants jointly argue that the evidence should be

suppressed because: (1) police officers lacked reasonable suspicion to stop the SUV in which

defendants were riding; and (2) police officers lacked probable cause to arrest defendants, search

the SUV, and seize evidence. In addition, defendant Burk argues that the statements he and his

co-defendant allegedly made should be suppressed because: (1) the statements were made

pursuant to an unlawful arrest; (2) the statements were given involuntarily; and (3) the statements

were given in response to custodial interrogation without the provision of Miranda warnings or a

voluntary waiver of <u>Miranda</u> rights.

The Court addresses each of the issues raised by defendants' Motions to Suppress in turn.

A.      **The Stop of Defendants Was Reasonable as a <u>Terry</u> Stop**

As a general matter, searches and seizures must be based upon probable cause and executed pursuant to a warrant. <u>See, e.g.</u>, <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967). However, under Supreme Court precedent in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123–24 (2000). "Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting that particular person stopped of criminal activity.'" <u>United States v. Brown</u>, 448 F.3d 239, 246 (3d Cir. 2006) (quoting <u>United States v. Cortez</u>, 449 U.S. 411 (1981)). "At the same time, we must allow 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" <u>Id.</u> (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)).

In evaluating whether reasonable suspicion exists, the Court considers the totality of the circumstances. <u>Id.</u> at 246–47 (citing <u>Cortez</u>, 449 U.S. at 417). "[O]fficers are not required to ignore the relevant characteristics of a location," such as its reputation as a "'high crime area.,'" "in determining whether the circumstances are sufficiently suspicious to warrant further investigation." <u>Wardlow</u>, 528 U.S. at 124; <u>United States v. Goodrich</u>, 450 F.3d 552, 561 (3d Cir. 2006). Evidence of an exchange of money for small objects has been considered relevant in determining whether reasonable suspicion exists, as has evidence that an individual who was known to officers as a drug dealer participated in such a transaction. <u>See United States v.</u>

McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (finding reasonable suspicion based on a police

officer's observation of an individual getting into a car and handing over money to a known drug

dealer); United States v. Cook, 277 F.3d 82, 84 (1st Cir. 2002) (finding reasonable suspicion

based in part on officers' observation of two men "in the midst of what looked to be some sort of

exchange" involving a gang member with prior drug trafficking convictions); United States v.

William, 139 F.3d 628, 629 (8th Cir. 1998) (finding reasonable suspicion where an officer

observed a ten minute interaction that involved the exchange of objects between four men, one of

whom was a known drug dealer).

Where a Terry stop is based upon a radio bulletin, "[a] finding of reasonable suspicion to

justify [a] stop require[s] the presentation of evidence by the government that the officer who

issued the radio bulletin had reasonable suspicion, not simply that it was reasonable for the

arresting officer to have relied on the bulletin." United States v. Coward, 296 F.3d 176, 180 (3d

Cir. 2002) (citing United States v. Hensley, 469 U.S. 221 (1985)).

In this case, Officers Landis and Linahan were conducting surveillance in an area "very

well known" for the sale of narcotics, particularly heroin. (Suppression Hr'g Tr. 8–9, Dec. 15,

2008). Officer Landis observed the defendants' SUV pass by his unmarked surveillance vehicle

on at least three occasions. (Id. at 9–10, 13.) On the third occasion, the SUV parked

approximately five feet in front of Officer Landis's vehicle. (Id. at 13.) Officer Landis watched

two males approach the SUV separately but in close succession. (Id. at 13, 14, 15–16, 31.) Each

male behaved similarly, handing what Officer Landis identified as money to an occupant of the

SUV and walking away with a clenched fist. (Id. at 14–15.) According to Officer Landis's

sixteen years of experience as a Philadelphia Police Officer—eight of which were on the

Narcotics Strike Force—these exchanges were drug transactions. (Id. at 6.) Moreover, one of the

9

two males Officer Landis observed was an individual he had arrested on two prior occasions and was "a known dealer" from the area. (Id. at 16.)

The observations Officer Landis made were sufficient to establish reasonable suspicion that defendants—the driver and passenger in the SUV—were engaged in a drug transaction. Thus, the Court concludes that the stop of defendants' vehicle by Officers Cricelli and Kachigan based on the information Officer Landis relayed over the police radio was reasonable under Terry.

### B.    The Arrest of Defendants and Search of Vehicle Were Based on Probable Cause

While as a general matter reasonable searches and seizures must be based upon probable cause and executed pursuant to a warrant, the automobile exception to the warrant requirement permits "warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991) (citing United States v. Ross, 456 U.S. 798, 825 (1982)).

"Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002). "Probable cause is determined by the 'totality of the circumstances.'" Id. (citing Illinois v. Gates, 462 U.S. 213, 230–31 (1983)). "We must assess the 'knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest' in determining if probable cause existed." Stubbs, 281 F.3d at 122 (citing United States v. Harris, 482 F.2d 1115, 1117 (3d Cir. 1973)).

In this case, after stopping the SUV identified by Officer Landis over police radio, Officer Cricelli approached the driver's side of the SUV and asked for defendant Burk's license, registration, and insurance. (Suppression Hr'g Tr. 72.) While doing so, he observed what he believed to be heroin packets on the floor in front of the rear seat of the SUV. (Id. at 72.) Although the windows of the SUV were tinted, including the driver's side rear window through which Officer Cricelli looked, there is sufficient evidence to conclude that the tinting did not preclude Officer Cricelli from seeing the heroin packets. As Mr. Colon testified, visibility through tinted windows depends on a number of factors. (Id. at 121, 130.) In this case, these factors weigh in Officer Cricelli's favor: he was standing in close proximity to the window; the driver's side window was down, allowing more light into the vehicle than would otherwise be the case; and it was daylight outside. While the weather was not perfectly clear, Officer Cricelli did not "recall any rain." (Id. at 110.) The only evidence the defense has provided to the contrary is a blogger's report posted over one hour before the arrest and from an undisclosed location in Philadelphia, stating that it was "overcast" and "spritzing out." (Supp. Ex. Support Def.'s Mot. Suppress Ex. A.)

In addition, although there is an inconsistency in Officer Cricelli's testimony as to how he came to view the heroin packets—either through the driver's side window, which was open, or through the driver's side rear window, which was tinted at fifteen percent—the inconsistency is not fatal to a finding of probable cause. In short, the Court credits the testimony of Officer Cricelli that he saw what he believed were heroin packets on the floor in front of the rear seat. Once Officer Cricelli observed the contraband in plain view, he had probable cause to arrest the defendants. Moreover, based on the automobile exception to the warrant requirement, Officer Cricelli had probable cause to search the vehicle and seize evidence without a warrant. Thus, a

11

search and seizure of drugs, drug paraphernalia, and a loaded weapon would have been reasonable under the Fourth Amendment without a warrant, but the police did not do so. Instead, they obtained a state search and seizure warrant. Because the Court finds probable cause justifying a warrantless search of the automobile and seizure of evidence, it is unnecessary to evaluate the sufficiency of the search warrant in this case. Counsel for defendant Burk admitted as much at the Suppression Hearing. (Suppression Hr'g Tr. 4.)

### C.   Defendants' Statements Were Voluntary

#### i.   The Statements Were Pursuant to a Lawful Arrest

Defendant Burk argues that "'[s]tatements made to the police following an illegal arrest are subject to the exclusionary rule . . . .'" (Def. Burk's Mot. Suppress 3 (quoting Wong Sun v. United States, 371 U.S. 471, 484–87 (1963)).) That argument is rejected because the Court concludes the arrest of defendants was based on probable cause and was lawful.

#### ii.   The Statements Were Given Voluntarily

Defendant Burk further argues that the statements should be suppressed because they were given involuntarily. (Def. Burk's Mot. Suppress 3.) Involuntary statements are inadmissible under the Due Process Clause of the Fourteenth Amendment. Colorado v. Connelly, 479 U.S. 157, 163 (1986); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994). To be voluntary, courts must be satisfied that the defendant's will was not "'overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, 503 U.S. 428, 434 (2000). Voluntariness should be judged by a "totality of the circumstances" test, taking into consideration the characteristics of the accused and the nature of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

In this case, defendant Burk has not offered any evidence suggesting official coercion of

any kind or that his will was "overborne" by the surrounding circumstances. The Court thus concludes that the statements were not exacted involuntarily and rejects defendant Burk's argument for suppression on this ground.

> ### iii.    No Custodial Interrogation Occurred

Finally, defendant Burk argues that the statements were given in response to custodial interrogation without the provision of <u>Miranda</u> warnings or a voluntary waiver of <u>Miranda</u> rights. In <u>Miranda v. Arizona</u>, the Supreme Court held that the prosecution cannot use statements "stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda</u>, 384 U.S. 436, 444 (1966). The cornerstone of an inquiry into whether a defendant's rights under <u>Miranda</u> were violated is whether a custodial interrogation occurred. The Supreme Court explained in <u>Miranda</u> that custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> The Supreme Court further explained in <u>Rhode Island v. Innis</u> that "the term 'interrogation' under <u>Miranda</u> refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. 291, 301 (1980).

In this case, there is no dispute that the statements were made while defendants were in official custody. (Suppression Hr'g Tr. 96–97, Dec. 15, 2008.) However, Officer Cricelli testified that he did not question either of the defendants beyond requesting biographical information, which is "normally attendant to arrest and custody" under <u>Miranda</u>. Defendants have presented no further evidence of interrogation by the officers. Based on this record, the Court concludes

that no custodial interrogation took place. In the absence of custodial interrogation, the officers were not required to Mirandize defendants. Thus, defendant Burk's argument based on <u>Miranda</u> is rejected. There was no <u>Miranda</u> violation.

**V.       Conclusion**

For the foregoing reasons, the Court denies both defendant Ramos's Motion to Suppress Physical Evidence and defendant Burk's Motion to Suppress Physical Evidence and Alleged Statement(s).


**BY THE COURT:**


**/s/ Honorable Jan E. DuBois**
**JAN E. DUBOIS, J.**